All righty. Mr. Kenyon, I'll be pleased to hear from you. Thank you, your honors. It's still morning, so good morning. It may have pleased the court. WECO is an insulation contractor that conducted operations in the Washington metropolitan area. Those operations included a lot, but there are three types I want to focus the court on. It installed the new insulation, it would repair insulation that was already in place, and sometimes it would remove old insulation and replace it. Now, the district court accepted that WECO stopped installing brand new asbestos-containing products in 1972, but it's undisputed and clear that WECO's operations continued for at least 20 more years through the mid-1990s. Hundreds of plaintiffs now every year sue WECO. The company continued to conduct operations installing insulation, removing insulation, and repairing insulation after 1972, and performed that kind of work through the mid-1990s. But it didn't include asbestos. To be very clear, Judge Winn, what the district court assumed and found was that after 1972, WECO did not install new asbestos-containing products. But as we all know, there's asbestos in pipes everywhere. There's asbestos in walls everywhere. So as WECO continued to operate... Where do you represent below that you continued to install asbestos products after 1972? I'm sorry, I don't understand that, Judge Agee. Where in the record do you assert below that your company installed asbestos products after 1972? I believe we do not state that in the record. The distinction I'm trying to draw is that to follow up on Judge Winn's question, how is anything other than asbestos relevant? It's the installation part, Judge Agee. So for instance, let me give you an example. WECO gets called in in 1979 to remove insulation on a pipe. WECO was not going to put asbestos on that pipe, but asbestos might have been on that pipe already. And in the removal process, in the repair process of the work that WECO continued to do for 20 more years, asbestos dust was released. And it is from that dust-causing operations after 1972... You argued that a lot. Correct. And that's why we focused on the court. The fact that we stopped installing asbestos containing products in 1972 doesn't get very far in this case. And one of the reasons why I wanted to raise it at the outset, because the district court and the insurers are fixating... At that point in your brief? Yes, sir. In our brief, what we said was that as plaintiffs continue to sue WECO every year, some of them allege, they all allege, that they're exposed to asbestos dust that WECO released. Some of them will allege that it's because we installed products. Even though our officials testified that they had stopped installing in 1972, that doesn't stop plaintiffs from making those allegations. But in addition, other plaintiffs will allege that it was the repair or the removal that released the dust. And you make that argument in your brief. I believe we do. When we talk about why the mere fact that we might have stopped installing asbestos-containing products in 1972 doesn't determine whether a claim is a completed operations claim or an ongoing operations claim after 1972. On the whole basis, and maybe I'm wrong about this, maybe you can take me to the place in your brief where you make this argument, but I don't remember that. And I thought the whole point of your argument was that just because there was some exposure before 1973, that doesn't mean that the exposure was completed, so to speak, until after 1973 or after 1972. I thought that was the whole basis of your argument. So that is one of our many arguments, Judge Agee. The point being, to be clear, that exposure before 1972 causes a bodily injury, and I want to be precise about the difference between continuing exposure and continuing bodily injury, because that goes to one of our objections to the Wallace and Gayle decision. So you have an exposure that might have occurred before 1972, but then the asbestos dust remains inside of a person throughout the remainder of their life and causes continuous bodily injury. And that bodily injury is undisputed that it occurs during the policy period of the two insurers who are in this case. Why didn't Wallace and Gayle decide this case? Well, for several reasons. Wallace and Gayle interpreted the policy terms that are at issue in this case. It interpreted the allocation question of whether Maryland is an all sums or a pro rata state, and it made an attempt to interpret the completed operations hazard. We have our beefs with those, which I will get to when we talk about the certification motion. But in addition, even if you accept those interpretations of the policy, there are questions that must be asked. Who has the burden of proof in demonstrating a completed operations affirmative defense that the insurers articulate? Have the insurers carried that burden of proof in this case? So Wallace and Gayle may be the foundation. We would like the court to certify those questions. And if it is not certified, and this court stands by Wallace and Gayle, then our merits brief proceeds on sort of the premise that Wallace and Gayle sticks, and that there are additional questions that must be decided, questions of state law, questions of federal rules of evidence that must be decided. So it doesn't control the outcome in this case. It either sets the table, or if this court chooses to certify those questions, it doesn't. So what I was going to propose to do, Your Honors, was actually start with the burden of proof question today. Because that one needs to be decided regardless whether the court certifies, whether the court stands by Wallace and Gayle. And on that, it is a first order question. I think the district court's error on the burden of proof is clear. And then I would like to move- What do you mean whether the court stands by Wallace and Gayle? What else can we do? You can certify and find out whether Maryland, in fact, that is the law of Maryland on both the allocation question and the completed operations question. Wallace and Gayle cites Maryland whenever they're interviewed, of course, for all special appeals. And the opposing counsel has cited other opinions since the Maryland interview. Why doesn't that take care of it? It doesn't take care of it, Your Honor, because this is the type of question that is being decided currently by the highest courts of states all over the United States. And they're coming to a reasonable disagreement. We now have nine states that have gone all sums and 12 states that have gone pro rata. Many of those, since Wallace and Gayle made an eerie guess at what the Maryland Court of Appeals would decide. And see, the question- Our jurisprudence is that if something the state's highest court hasn't spoken on, but the intermediate appellate court has spoken on, you have a very high burden in certification in that circumstance. Well, I believe, Judge Agee, that in that circumstance, a very high burden for this court in actually applying the substantive law of the state to reject it. This court says it must be clearly convinced that the highest court of the state would not follow the Court of Special Appeals. But the standard for certification is different. The standard for certification depends on what the state's own certification procedures allow for. And as Maryland said in the Proctor v. WMATA case, and this is the Maryland Court of Appeals, that they adopted, the state adopted a certification statute that is for the, quote, widest possible use of certification. And what's significant about that case, and the reason I will dwell on it for just a moment, is in that situation, there was only a decision from the Maryland Court of Special Appeals. The issue was found to be an important one- Well, Your Honors, I wasn't a party, and WECO was not a party in the Utica Mutual case, so we had no opportunity to take any appeal from that. I don't think we're trying to do procedural shenanigans in that respect or anyhow dishonor the Maryland system for taking direct appeals from the Court of Special Appeals or to the Court of Appeals. What we're trying to do is ascertain the law of the highest court of Maryland, which is, in fact, the obligation of this court under ERIE. When did the injuries occur? Which injuries, Your Honor? The injuries on our breach of contract claims or the injuries of the plaintiffs who were- The injuries, the asbestos injuries. The WECO has insurance policies here from U.S. Fire that were issued in the mid-70s and from St. Paul that were issued in the late 70s through the early 1980s. All of the claims that are at issue in our case are claims where the plaintiff alleged that their bodily injury occurred during those years. The exposures presumably happened before the 1975, so that it would then run through all of these policy periods and up to present. But to be fair, when we're talking about their aggregate limit defense, we're dealing with claims that the insurers have paid out over the last four decades nearly now. They've been slowly keeping a tally on their own records of claims that they've been paying out and now in the mid-2000s say, we think we've reached the limit. We think we don't have to pay anymore. With respect to the physical injury claim, the operation ceased in 75, right? No, and that's where I started, Judge Wilkinson. The installation of new asbestos products stopped according to the district court in 1972, but WECO undisputedly continued to work as an insulation contractor through the mid-1990s. But for the present purposes, WECO was still operating in and it was still operating in 79 through 83 when St. Paul issued those policies. It was removing asbestos from pipes and from walls. It was repairing asbestos, but it wasn't installed. The injuries must have occurred three years before the complaint was filed in 2015. So you're talking then about a breach of contract in the statute of limitations question? Yeah, I'm talking about the statute of limitations question. Sure. I guess that's a breach of contract. That is a breach of contract. We saw indemnification for claims that are pending at the time we filed. Well then, why wouldn't the breach of contract have occurred in 2003? Sure, because... When the insurers notified you that you had exhausted the aggregated limits, the aggregation limits in primary insurance in 2003 and that you'd exhausted the aggregated limits for purposes of the excess insurance in 2009. I understand. That only applies to... Let me just hold on for one second. So the notification would certainly have been a breach because you're claiming that they have, right at this very time, that the aggregated limits have not been exhausted. And well before three years of the time that this complaint was filed in 2015, both insurers notified you, which is that they had been. So why aren't you running afoul of the statute of limitations? Because the insurer's duties to WECO are a duty to defend and a duty to indemnify, not a duty to maintain records. And so while they gave us notice in the early 2000s that according to their own bookkeeping, they believed the aggregate limits were exhausted, they did not actually breach their contractual obligations to WECO until we sought indemnification, until we sought defense in many years later from that and said... I'm looking at a number of countless paragraphs, 50 and 51 of the complaint. The allegation there is improper allocation of both paragraphs. There isn't anything about failure to defend. There isn't anything about failure to pay. Well, I believe when we get to the actual claims at the end of that complaint and the request for relief, the request for relief is that they pay us on the indemnification for the cases that are pending against WECO in state court right now. And Judge Agee, I'm not denying that they sent us letters in the early 2000s and that WECO knew what the dispute... You have a count for breach of contract. You have to allege in that count, here are the elements of the contract. I don't see that in there. What Judge Agee, we obviously anticipated their affirmative defense. We said, we're going to have a dispute in this court as to whether or not in fact... We knew why they were breaching. It's their affirmative defense that there is a limitation of liability. I mean, it's not often that an insurance company writes and says the limits have been exhausted. I can't speculate, Judge Wilkinson, as to why we didn't bring suit. You're no longer covered. Well, that's the false part, Judge Wilkinson. We are still covered. It's only that insofar as there might be a operations claim in the future, that they would not have to provide indemnity or defense. We didn't know... Well, because in hindsight, now we know that completed operations claims have been alleged against WECO. At the time, we didn't know what was coming. Did you bring a claim for a declaratory judgment at this point? I believe under Maryland law, the dispute was right. You did not have to wait for them to deny a duty to defend? We don't dispute that, Judge Wilkinson. We could have sought a declaratory judgment at the time, but Maryland law... Well, why not? Why not? Well, that would involve speculation, Your Honor. I wasn't even a practicing lawyer at that time. I can't tell you why, but I can say that under Maryland law, my client didn't have to. They've addressed this question on point and said that anticipatory breach by an insurer, a mere notice that they do not plan to give you indemnity or defense in the future, does not start the running of the statute of limitations. Now, the insurers claim that if we don't bring these declaratory judgment actions, we're going to end up in this sort of universe where there's constant lawsuits. That's not true. We will have a fight. This is probably the case where that fight will take place, and the court will decide whether they have reached the limits of their aggregate limits. If they have, that would be collateral estoppel between the parties in all future litigation. But Maryland gave us the option not to sue merely upon anticipatory breach, and WECO took that option. We waited until they actually refused indemnification. So for that reason, and I'd also point out, that statute of limitations only runs to three of the types of policies at issue in this case. It does not fully resolve all of the issues, I believe, of St. Paul's excess. St. Paul's excess, they did not send us a letter until the late 2000s, and so even on their cramped interpretation of the statute of limitations, we filed on time for that one. So the statute of limitations doesn't really drive this case. The burden of proof drives this case, and the certification drives this case. I haven't really addressed burden of proof. I'm about to run out of my time, but I would like to use my time in the best way possible for your honors. If you'd like me to continue, I will. Payments for completed operation, for completed operations coverage don't count toward aggregate limits. That seems an odd contractual provision that would leave the insurance company just totally exposed with no limit virtually to its liability. What insurance contract would leave a party that exposed? This seems to me to just run against any kind of rudimentary business sense. Well, a couple of responses, Judge Wilkinson. As to ongoing operations, there's no aggregate limit. The distinction is a distinction between a type of risk. The risk that comes from operations that are complete. For an insulation contractor, maybe they over-insulate a pipe, and the pipe gets so hot that it bursts. That's a distinct type of risk. That's a risk that's covered by the completed operations hazard. An ongoing operation presents different types of risk. Those are messy work environments. There's ladders that fall. There's dust that gets in the air, and so the insurance company undisputedly provided us non-limited, unlimited coverage for our ongoing operations. So, if there were bona fide... But isn't the potential liability for completed operations coverage much greater in the sense that it reaches way back? I don't think I would say it's much greater, Your Honor. They all reach way back to the 70s when their policy was in effect. The bodily injury had to occur during the policy period for us to have any coverage to begin with. With asbestos and other long-tail injuries, you have an injury that began sometime a long time ago, persists for decades, and then finally really comes full circle. If there are bona fide payments, if they actually made payments for claims that were for completed operations, we do not dispute that they get to put those payments into the completed operations bucket, and that when St. Paul pays out $32 million of those, or when U.S. Fire pays out $9.3 million of those, that they can say, we're done paying completed operations claims. But everyone here would say that as to an for us is not so limited. It is unlimited. And that's why the burden of proof question matters so much to this case. All right. Thank you, sir. Okay. Thank you, Your Honors. Mr. Lee. Thank you, Your Honor. May it please the Court. My name is Harry Lee. I represent St. Paul Fire and Marine Insurance Company, and I'm arguing for the apolice. Judge Agee, I'd like to address the point you raised because I while in Yale, having been in Utica Mutual, having been in this case now, trial level all the way through, I want to read from the record, S.J.A. 1569. The issue is to exactly whether there were any operations during the insurer's policy periods, during the apolice policy periods, was hotly contested and was forced at the trial. There was a motion to compel to get an answer. The answer was compelled, and there was a supplemental response at S.J.A. 1569, and this is Waco's answer. Waco states that it does not presently have any information indicating that it handled, repaired, removed, or disturbed asbestos or asbestos-containing materials between April 1, 1979 and April 1, 1983. Those are the St. Paul policy years. St. Paul forced that answer because with Judge Nickerson, he was frustrated, as was St. Paul, as to whether there really was any claim, Waco was saying, that it actually did anything, any operations that involved asbestos at all during these insurer policy periods, including U.S. Fire. The insurers went out and found, even though it wasn't their burden, went out and found information and showed that the operation, not just the sales, but there was no evidence of operations with respect to the claimants that were at issue, the supposedly misallocated claims, the mischaracterized claims. So this is from 1979 going forward? 1979 to 1983. So that was an admission. 1972? 1972, Waco admitted it stopped selling asbestos and stopped installing new asbestos. We wanted to get to the further question that Mr. Killian was addressing. Did it do anything else with asbestos in an operational way during our policy periods? Because that's what matters to Wallace and How about between 1972 and 1979? Are any of the policies at issue here covering that period? Yes, the U.S. Fire policies go between 1975 and 1979, and so there was evidence adduced. The insurers put in evidence showing the contracting records with respect to the claimants that were identified by Waco as having been mischaracterized and showed that operations could not have been happening when they were in particular buildings. Waco wasn't there. Other people might have been there, but Waco's operations of any kind had ceased before 1975. Waco did not put in any evidence. If it did try to put any evidence, Judge Nickerson ruled it all inadmissible. So there is only evidence of no operations. That's the record in this case. Once you figure out that that's the record in this case, Wallace and Gale and Roberts control this case, because those places decided two things under clear Maryland law. Number one, that you prorate the injury, a long-tail claim like asbestos, to each of the different insured years and to any uninsured years where coverage was available but wasn't purchased by the policy. Second, you take a look at the injury that happens in each year with respect to each carrier for St. Paul 1979-1983, for US fire 1975-1979, and you ask yourself for the injury during that policy period had operations been completed before that point in time. If they are, the liability associated with that injury goes into the completed operations bucket, which is aggregated. St. Paul and US fire paid $41 million of completed operations claims, and this is exactly how the Wallace and Gale case came down. This is exactly what Judge Wilkinson wrote in the Roberts decision in the lead paint context, which is sort of an analogous context, and this is exactly what Utica Mutual says, which is the Court of Special Appeals decision in Maryland, adopted by several additional Court of Special Appeals in Maryland. In addition, towards the certification question, the Utica Mutual case and the Wallace and Gale case all relied on Bausch and Lomb. Bausch and Lomb is a 1999 Court of Appeals case, Maryland's highest court, and in that case, the Court of Appeals remanded back to the State Trial Court for development of evidence as to how to allocate between the years. It never would have remanded back to the trial court if it didn't believe pro-rate allocation was required. It just didn't have, the trial court hadn't developed the evidence of how much damage had happened in each year because it was a property damage case. It was a contamination case, and they needed to know how the pollution had flowed in the groundwater in each year, and they wanted to take expert evidence, and the Court of Appeals sent it back to the Wallace and Gale and the Roberts decisions. You realize that not only did Judge Nickerson do his job, looking at massive briefing, wrote significant opinions, very well reasoned, but there's no admissible evidence that goes the other way, and WECO concedes that Wallace and Gale applies. In fact, if you look at the record and the briefing, WECO doesn't actually appeal the pro- rate law. It actually simply says in its brief at pages 39 to 41 that it thinks that it ought to be certified. What we know is that certification is improper here. There has been no change in the Maryland law. There's been no change, no suggestion by the Maryland High Court that it wants to change the law at all. WECO discussed the various state Supreme Court decisions. Nine have gone towards pro-rata since 2002. Now, it's irrelevant. It's what Maryland does, not what other state courts do, and these aren't tied together in any form or fashion, but nine have gone the pro-rata way. In addition, there is nothing we would suggest to the Proctor case. Mr. Killian noted that the Maryland Court of Appeals decided to accept certification in that issue. That was an extremely unique case. It dealt with the Washington transportation system, which is, your honors may know, a three-state system, D.C., Maryland, and Virginia. The buses go across state lines, and there were two rulings, one from Virginia and one from D.C., that conflicted with the Intermediate Court of Appeals case in Maryland. Court ruling, consortium issues, and sovereign immunity waiver issues. The district court wanted certification because it needed an answer because it knew this was a unitary system. These three states work together when it comes to the transportation system. There is nothing like that going on in this case whatsoever. Your honor, there is an issue that WECO has raised as to this insolvency issue, that there ought to be an exception to prorating to the uninsured years because if the insurance company had purchased insurance but suddenly found itself 25 years later with an insolvent insurance care, that somehow that should be placed on the back of all the insurers and there should be no allocation to that year. That makes no sense, number one. It makes no commercial sense, number one. That was referenced in the fourth circuit. That made no commercial sense. But importantly, Utica Mutual, the Court of Special Appeals, where you have sufficient law to decide this issue, you don't need to certify it, says that it is the availability of insurance at the time. Here we know it was available at the time because it was purchased at the time. The other carriers had nothing to do with who the policyholder chose to buy that insurance policy from and whether or not that became a credit risk 25 years later. Your honor, briefly with respect to the limitations point, Judge Wilkinson, you asked some questions about that. With respect to 2003, for example, with respect to St. Paul, is they gave notice at the time after they paid millions and millions and millions of dollars and when they got to that limit, they said we're done. We've been telling you we're going to get done. We're now done and we're not paying any more claims under this primary policy. 2003. 2004, more claims come and they're not paid by St. Paul under that policy. They're paid by St. Paul and other carriers under other policies. The claims that are at issue here, WACO wants paid under that 2003 policy. So it wants us to go back and determine this is what Judge Nickerson found is extremely unfair. There's been actually bizarrely almost every issue in the case has been argued in the prior cases today. We talked about Robert's case before I got up in the other case. So I was a little panicked for a minute but with respect to limitations, what was clear is that we did not pay the claim the next year and the next year and the next year and the next year. And that's on top of the notice. It's on top of the notice and the notice is crystal clear and not only does it give notice, it says and you should consult your counsel about it. We're not giving you legal advice. You may want to file a D.J. They could have done it then. They waited as your honors suggested in the complaint. They pled a characterization claim, breach, a misallocation claim, not a pay me claims in the future, not pay me these claims, but you didn't do it right in your prior policies before you declared exhaustion and you're wrong about your exhaustion. Well, that happened in 2003. It happened with respect to U.S. fire in 2009 and it was years later, not until 2015 until there was a complaint. Limitations clearly exist. Mr. Killian says we're not required by Maryland law to bring a declaratory judgment for anticipatory breach. And I guess your response to that is you actually declined to pay the claim. Yes. So it wasn't an anticipatory breach? It wasn't anticipatory at all. You breached. I mean according to them. We breached. We breached. And in every single year thereafter, they could have said breach because we weren't paying their claims under that policy. You notified them that the aggregate limits were exhausted. You declined to pay. It isn't an anticipatory breach. It's a breach. And it's way before 2015. Way before. And to go back, and this is what Judge Nickerson mentioned, to go the records are at WECO. And these are operations that took place 30, 40 years ago. Most of the people aren't alive anymore. A lot of the corporate witnesses at WECO, only some of them are alive. There's some testimony from 20, 30 years ago in cases. That's the evidence we're having to rely upon. We're looking at timecards, handwritten timecards as to whether somebody was on a job or not on a job. We're looking at contracts as to whether it took two weeks to do that insulation job or three weeks to do that insulation job and was it done in this year and in that year. The nightmare of doing this from 40-year-old records with respect to a particular claimant who's no longer alive relating to a claim we paid in 2001 to exhaust a 2003 policy is incredible. And that's what Judge Nickerson said. That there's not only no anticipatory breach, but the reasons for limitations are the reasons why it is. Let me address one other issue which is the burden of proof issue. With respect to the burden of proof, Judge Nickerson found that it belongs on the policyholder because classification of a claim is under Maryland law a requirement of proof of proving your right to coverage. It is not an exclusion. It is not some sort of way of taking coverage away from you. If you want this limit, you've got to prove that classification. If you want that limit, you've got to prove this classification. All of that, Evans, rests with WECA. It's their records that will tell whether a particular worker was at a place at the same time during an operation being exposed to asbestos and whether it was an operation during our policy period because that's what Wallace and Gale and Roberts require. Judge Blake, Judge Catherine Blake in the Porter-Hayden decision addressed this point at the burden of proof issue. Classification of a claim is a matter of showing entitlement to coverage under Maryland law. A policyholder argues that it was conducting operations that resulted in the release of asbestos fibers such as a tie-in operation or asbestos removal operations. Record shows they don't exist, but let's say they did for a second. During the relevant policy periods, then the burden is on the policyholder to prove that. There's been no Maryland law that's different than that. No one has contested that. In fact, even in Purdue in the Fourth Circuit, this court held that an allocation between covered and uncovered claims, that burden is on the policyholder, not on the carrier. They have the best access to the proof. And we have raised a waiver argument. I said that you talked about every other issue in the case. You talked about that one a little bit earlier. Different waiver argument here. With respect to that burden of proof, we put them on the run in front of Judge Nickerson and we asked them, are you really arguing that classification is our burden or the classification is an exclusion and therefore it is our burden? They said, and this is at Duane Appendix 987, that aggregate limits do not function as exclusions. They said that they were not arguing that the insurer's prior claims classifications were incorrect. On the same page, they said that the burden of proof analysis in Porter-Hayden, Judge Blake, which I just read to you, was not incorrect. They are making the exact opposite arguments in this appeal. And we believe that that constitutes a waiver. Your Honor, I know I do have some more time, but unless there's other questions, I'm happy to wrap up. Jim. We have no further questions. Thank you. Mr. Killian, let's hear from you in rebuttal. Sure. I have one initial question to ask you, and that is, you keep talking about the burden of proof here, but the aggregation limits, when I look at the policy, seem to me to be quite clearly in the coverages section. No, strongly I disagree. They are in a separate provision in the exclusion section. They are in the limits section. It's not a black and white world that it's either coverage or exclusions. It's coverage, exclusions, and limits. And as the insurers concede, page 28 of their briefing... Why isn't a limit a coverage? Because a limit is four covered claims that after 30 years, they say, oh, we're done. We don't want to pay these anymore. And so when you look at what we have to show, what WECO has to show to get coverage, it's a very simple equation. Was there bodily injury? Was it during the policy period? If we demonstrate that, then it shifts to them to show under the exclusions. Is it from a snowmobile? Is it from a plane crash? Or to the limits section, with completed operations claim for which they have already exhausted their limits. Judge Blake got that wrong. Can you really split off the coverage for an underlying claim and the limits on recovery? The limits, Judge Wilkinson, aren't the particular point. But as a matter of common sense, aren't the limits part and parcel of the overall coverage? No, strongly disagree. The limits are aggregate. I'm going to explain why, if I may, Your Honor. They're aggregate limits. So they only kick in after $32 million worth of payments for St. Paul. So we get an asbestos claim in in 1983. Someone wants $500,000. We pass it to the insurance company. We don't have to show it was a completed operations claim or an ongoing operations claim. It's covered because bodily injury happened during their coverage years. It's only 30 years after the fact when they come forward and say, according to our internal tally, we've paid out $30 million and claims were getting pretty close to the limits. Or we then file a suit saying we want coverage in this particular case filed in 2014. And they say, no, we're done. We think we've reached the contingents that are made with respect to the payouts on claims for completed operations coverage that your counsel made. I'm afraid I can't answer that, Judge Will. I don't understand what you mean. Do I agree to what? Do you agree to it that they paid, that before the notification was sent, that the aggregate limits were exhausted? We'd strongly disagree with that as well because they haven't proved as their burden. They paid out many millions of dollars. But as compared to sending you the notice in 2003 and 2009. What we dispute, Judge Wilkinson, is their classification, their burden. They have to come forward. It's not, they haven't even tried to show that claims that they paid in 1984 were for an ongoing operation claim or a completed operation claim. But they were all under the 2003 policy. There was no policy issued in 2003. The policies were issued in 1979 through 1983. We were receiving payments as the loss runs that they've adduced show. We were receiving payments for them through the mid-2000s. They believed that we're getting close to those limits. Did they decline to pay out claims after they had sent you the notice at the end of the year? Many years afterwards, yes. What? Many years afterwards and thus we brought. So why is this a case of anticipatory briefs rather than actual briefs? Because they were actually paying claims in the mid-2000s. The loss runs that they've submitted as evidence, which are in the sealed joint appendix here, show payments made in the mid-2000s. We were receiving money. They gave us a warning that they thought the limits were reached or soon to be reached, but the payments were still coming through. We had no breach of contract claim at the time. I want to follow up on what your opposing counsel said. Can you direct us specifically in the record to the joint appendix where we would find evidence of operations between 1973 and 1979 by your client and coverage? So our position was that it is the claim that determines how you classify a claim, not the operations themselves. I understand that. What I'm looking for is there evidence in the record in that period of time that says Joe Smith was injured on the job and there's an asbestos claim. Well, we keep coming back to this, Judge Agee and Judge Wilkinson, Judge Winn, about the burden of proof. We don't have that evidence and that's why the burden of proof is the most important question in this case. But to our view, it's the most important question. If they have the burden to prove what the claims were that were asserted against WECO, then the absence of the evidence in the record, Judge Agee, means that they can't prevail on their classification. So the one question I wanted to address at the outset is the one I haven't gotten to yet. You're not going to be able to prove anything with respect to so much of this. It's so long ago. Well, Judge Wilkinson, it's easy to maintain a complaint on a file. That's what they do. They're insurance companies. They run our defense. They do the settlements under the but the express power to investigate and settle all claims. And in that role, they are in the position to keep a file. That's all they needed to do, Judge Wilkinson. And because they didn't keep that. Even many, many years after the statute of limitations is reasonably believed to be expired? One of us is going to be penalized because the records weren't kept. And the question then is, will it be the insurers who knew one day they would have to assert a limitation defense? Or should it be WECO, just the one individual policyholder? So we ask, Your Honors, that the judgments of the many judgments below be reversed and the case be certified so that the Maryland Court of Appeals may decide once and for all what these policy provisions mean. Thank you for your time. Thank you.
judges: J. Harvie Wilkinson III, G. Steven Agee, James A. Wynn Jr.